(Reap. Dec. 9061)

PARAMOUNT IMPORT CO., INC., ET AL. *v.* UNITED STATES

Entry No. 792968, etc.

(Decided January 29, 1958)

*Barnes, Richardson & Colburn* (*Hadley S. King* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

OLIVER, Chief Judge: The appeals for reappraisement, enumerated in schedule "A," hereto attached and made a part hereof, relate to

certain glass beaded necklaces and other items of jewelry, or glassware, that were exported from the Jablonec District of Czechoslovakia during the months of February, March, and April 1949. Entry was made at the port of New York.

The *per se* values of the various articles are not in dispute. The sole question before me is whether an item described on the invoices as "15% buying commission" is a part of export value, section 402 (d) of the Tariff Act of 1930, concededly the proper basis for appraisement of the merchandise in question. The limited issue brings into application the well-established principle that when, as here, only one item of an appraisement is challenged, the presumption of correctness as to all others is not destroyed, and, therefore, they stand as presumptively correct. *United States* v. *Fritzsche Bros., Inc.*, 35 C. C. P. A. (Customs) 60, C. A. D. 371.

Whether or not an item is a buying commission is dependent on the facts in each particular case. *United States* v. *Bauer et al.*, 3 Ct. Cust. Appls. 343, T. D. 32627. Judicial authorities are consistent to the effect that a charge for services associated with the purchase of merchandise in the foreign market, and which is not an amount that inures to the benefit of the seller, is a buying commission, which, although affecting the cost of goods to the importer, is not part of the market value of the merchandise, and, hence, is a nondutiable item. *United States* v. *Case & Co., Inc.*, 13 Ct. Cust. Appls. 122, T. D. 40958; *United States* v. *Alfred Kohlberg, Inc.*, 27 C. C. P. A. (Customs) 223, C. A. D. 88; *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T. D. 31007. In this case, plaintiffs contend that the item in question meets the judicial interpretation of a buying commission and, therefore, should not be included in determining statutory export value. Defendant contends that, at the time of exportation of the merchandise in question, the industry affecting the articles under consideration was nationalized by the Government of Czechoslovakia, requiring all transactions to be handled through the Czechoslovak Glass Export Co., Ltd., a governmental agency, and that, therefore, the said invoice item is not, in fact, a buying commission, but part of the market value for tariff purposes. I proceed to review in detail the record before me.

The president of the importing corporation testified that he has been connected therewith, and with its associates, for 25 years; that, in the course of his duties, which were primarily buying, he visited Czechoslovakia two or three times a year from 1934 until the latter part of April 1949 and that, throughout that period of time Eduard Krause Synove acted as commissionaire for plaintiffs in all purchases of merchandise in the Jablonec District of Czechoslovakia. The witness described the function of the commissionaire as follows (R. 16–17):

They went with me at the beginning primarily for translation, because I didn't understand the German or Czech language, and also more important than that, to help me create in a sense that they would tell the maker what I wanted, and they would then follow up the merchandise that we ordered, bill us for it properly in the exchange, pack the merchandise carefully, examine it, cable us when things were going to be shipped.

Further testimony of the witness discloses that all purchases, during the period of the shipments under consideration, were made in the presence of a commissionaire, who always accompanied the witness to the manufacturers or manipulators who were located in small villages. Selections of merchandise and agreement on prices were made between the importer and the manufacturers, but always in the presence of a commissionaire who recorded the transaction. In addition to the purchases of merchandise by personal contact with manufacturers and the commissionaire, the importer also ordered merchandise by cable and "some written on regular order forms," addressed to the commissionaire. Supporting the witness' testimony is a collection of 17 "PURCHASE ORDER" forms (plaintiffs' collective exhibit 3), showing orders placed by the importer with its commissionaire, Eduard Krause Synove, between December 6, 1948, and April 1, 1949. The witness explained that where no price is shown on the "Purchase Order," it indicates that "we had the same article previously, and the price remained the same." The commissionaire, for services rendered, received a commission of 15 per centum of the price quoted by the manufacturer.

In addition to the oral testimony hereinabove reviewed, plaintiffs also introduced into evidence two affidavits. In the first (plaintiffs' exhibit 1), executed by Ernst Prade, the witness stated that he was employed by the said Eduard Krause Synove from 1928 to May 15, 1949, "when the entire industry was nationalised by the Czechoslowakian [sic] Government on June 30th 1949." The witness testified that he was "personally familiar with export transactions and market conditions prevailing in the Jablonez district relating to the manufacture and exportation of merchandise to the United States, particularly beads, jewelry and stones," and that, throughout his employment with the said commissionaire, he was "personally familiar with orders placed with the various manufactureres," including those that manufactured all of the articles covered by the shipments involved herein. Referring to the business of Eduard Krause Synove during the period covered by these shipments, the witness testified that the firm acted for plaintiffs and other American importers solely as "buying agent placing orders for them and supervising, packing and preparation of export documents of merchandise for their account," that orders were placed with the foreign manufacturers "for the account of American importers at the prevailing market prices for export," that his employer, as a commissionaire or buying agent,

received a "15% buying commission" for services hereinbefore described, and that the manufacturers received no part of the commission. The affidavit is concluded with the statement that the trade practice or course of trade described by the witness "prevailed up to June 30, 1949, when, by decree of the National Administrators, all exports of this line of merchandise were taken over by Glassexport, a Czechoslovakian Government Agency."

Plaintiffs' second affidavit (plaintiffs' exhibit 2) was executed by Otto Neumann, who stated that he "was a commissionaire in the Jablonz district in Czechoslovakia since 1931," that, from 1947 to June 30, 1949, he was in the employ of F. J. Hübner of Jablonec, Czechoslovakia, as manager of its business, that he "remained as managing director for this firm up to June 30, 1949 having received an official notice on May 15, 1949 that the entire industry was to be nationalized." Emphasizing the course of trade followed in the Jablonec District of Czechoslovakia, the witness stated that "almost 100 per cent of the business was done exclusively in the Jablonz district for the purchase of buttons, beads, jewelry and similar articles through commissionaires who acted solely as buying agents for American importers." The witness' testimony concerning the services rendered and commission received by commissionaires is substantially the same as that offered by the previous witness, who executed the affidavit, heretofore reviewed (exhibit 1, *supra*). He testified, further, that "expropriation and nationalization of Czechoslovakian firms did not take place until June 30, 1949."

Defendant introduced certified copies of two documents. The first (defendants' exhibit A) is titled "OPERATIONS MEMORANDUM" and bears the date of January 29, 1957. The document is directed to the Department of State from the American Embassy at Prague and consists entirely of the quotation of a "Note" from the "Czechoslovak Ministry of Foreign Affairs" to the American Embassy at Prague. No explanation is offered to show the function of the Czechoslovak Ministry of Foreign Affairs or its status as a governmental agency. Reference is made therein to a so-called "Collection of Acts," without setting forth, in any way, the context of the provisions of the laws or either "Notice," mentioned therein, and upon which the conclusion expressed therein is based. The document is not a factual presentation of the information sought to be conveyed; it is not a proper consideration toward disposition of the present case.

Defendant's second document (defendant's exhibit B) is a certified copy of a report titled, "FOREIGN SERVICE OPERATIONS MEMORANDUM," dated January 18, 1949, directed to "THE TREASURY DEPARTMENT, BUREAU OF CUSTOMS," from the American Embassy at Prague. Embodied in the report is a list of "the export houses that are members of the Group of Jablonec Exporters." The list includes the name of

"Krause, Ed., synove," hereinabove identified in the outline of plaintiffs' evidence as a commissionaire. The said report, referring to the "export houses," enumerated therein, states as follows:

* * * Members of this Group, while nominally existing under their old firm names, are branches of the Jablonec section of the Czechoslovak Glass Export Co., Ltd. The main task of the Group is to oversee the trade activities of each member in order to insure the maintenance of prescribed prices and practices. The government control over the Jablonec export trade has become more strict during the past six months because of the completion of the reorganization of Czechoslovak trade into state monopoly companies. The various firms are continuing to export in their own names mostly in order to continue customer good will and partly because they had previously specialized in particular articles, and their organization had been geared to handle special requests.

Continuing further with an explanation of a trend in trade practice under the Czechoslovak Glass Export Co., Ltd., the report states as follows:

In keeping with a general trend to separate production and distribution in Czechoslovakia manufacturers of goods are not permitted to engage in trade, and it has been stated by Czechoslovak officials that the manufacturers of Jablonec goods will no longer be able to sell direct to American importers which has hitherto been the possibility. In addition it should be noted that the enclosed schedule of buying commissions applies only when one customer has purchased $20,000 or more worth of Jablonec goods during a single year's period. For the purpose of the application of this rule goods selling at net fixed prices are not considered as part of the total sum. Those customers who buy quantities of goods to a value less than $20,000 buy at fixed prices for all articles which prices include the profit of the company and which runs higher than the stipulated 15 per cent buying commission.

It was stated by the Czechoslovak Glass Export Co., Ltd. that by this policy more important customers will be given preference and protected.

The report concludes with the following paragraph:

In addition to all of the rebates mentioned, there is a 2% for cash that is usually payment by a letter of credit against a forwarder's receipt. Prices of Jablonec goods are fixed by the Czechoslovak Glass Export Co., Ltd. in conformity with prices determined at the various factories which are fixed by the Ministry of Industry. Prices set by the export companies are subject to review by the Ministry of Foreign Trade.

From the foregoing analysis of the record, it appears that, at the time of exportation of the merchandise in question, trade practices in the export market of the Jablonec District of Czechoslovakia were undergoing changes. Government control over all elements of trade was being developed, yet there remained effective the ordinary course of trade in which sales were made through commissionaires who acted as buying agents and received a commission for their services. Defendant's evidence (exhibit B, *supra*) includes the admission that various firms continued to export in their own names "partly because they had previously specialized in particular articles, and their organization had been geared to handle special requests." There is nothing

in the record before me to indicate the foreign exporter of the merchandise under consideration was not among those firms that continued to export in their own names. On the contrary, plaintiffs' positive proof—oral testimony and documentary proof, coupled with the collection of "PURCHASE ORDER" forms—is persuasive toward the conclusion, which I find to be applicable, that employing the services of a commissionaire, such as were employed in all of the transactions involved herein, followed the ordinary course of trade during the period covered by the shipments under consideration. The factual situation makes controlling of the present issue the decision of our appellate court in *United States* v. *Nelson Bead Co.*, 42 C. C. P. A. (Customs) 175, C. A. D. 590. There, as here, the merchandise was exported from Czechoslovakia, and the sole issue was whether an item of 15 per centum buying commission should properly be considered as part of the dutiable value of merchandise. In holding that the item was not a dutiable one, the majority of the court, speaking through Judge Worley, stated as follows:

So far as the instant item is concerned, the record leaves no doubt that the merchandise was purchased through a commissionaire who performed services on behalf of the importer; that the commissionaire acted as a buying agent and received from the importer a commission of 15 per centum for services rendered; and that none of said commission inured to the manufacturer. While that item adds to the cost of the merchandise to the importer, the facts here convince us that it is a *bona fide* buying commission and, as such, does not enter into the dutiable value of the merchandise.

It is my considered opinion that the foregoing quotation has equal application, with the same force and effect, in the present case, and I so hold.

I find as matter of fact:

(1) That the merchandise in question consists of glass beaded necklaces and other items of jewelry, or glassware, that were exported from the Jablonec District of Czechoslovakia during the months of February, March, and April 1949.

(2) That, during the period covered by the shipments involved herein, such or similar merchandise was usually or ordinarily bought in the foreign market for exportation to the United States through a commissionaire who acted as buying agent for the American importer.

(3) That, for such services associated with the purchase of the goods, the commissionaire received a commission of 15 per centum.

Accordingly, I hold as matter of law that export value, as defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for appraisement of the present merchandise, and that such statutory value does not include the item described on the invoices as "15% buying commission."

Judgment will be rendered accordingly.